Judgment rendered July 15, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,915-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

ALEXANDRA E. HARRIS             Plaintiff-Appellant

versus

MARK DOUGLAS ROGERS             Defendant-Appellee

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 618,247

Honorable Katherine Clark Dorroh, Judge

* * * * *

WEEMS, SCHIMPF, HAINES & MOORE          Counsel for Appellant
By: Kenneth Patrick Haines

ROBERT M. HANNA                         Counsel for Appellee

* * * * *

Before STONE, COX, and MARCOTTE, JJ.

**MARCOTTE, J.**

This Rule 5 appeal arises out of the First Judicial District Court, Parish of Caddo, the Honorable Katherine Dorroh presiding. By judgment rendered and signed on November 4, 2024, plaintiff, Alexandra E. Harris ("Alexandra"), and defendant, Mark Douglas Rodgers ("Doug"), were awarded joint custody of their minor child, A.R. Doug was designated primary domiciliary custodial parent with Alexandra to have custodial periods as set forth in the Joint Custody Implementation Plan ("JCIP") attached to the judgment. Alexandra appeals. Finding no abuse of discretion in the trial court's judgment, we affirm.

## FACTS

Doug and Alexandra were never married but had a dating relationship that resulted in the birth of A.R. on March 5, 2019. Alexandra filed a petition to establish paternity, custody, and child support in which she sought, *inter alia*, joint custody of A.R. and designation as domiciliary parent. A.R. was not yet five months old at the time suit was filed and was still breast feeding.

Doug answered and filed a reconventional demand, seeking visitation on a stair-stepped schedule, which provided additional time as A.R. became older and more autonomous. An interim order (the "First Interim Order") was entered whereby Doug was acknowledged as the biological father of the child on October 16, 2019. The First Interim Order also required Doug to pay $800 per month in child support.

The parties abided by the terms of the First Interim Order without incident until Alexandra began a romantic relationship with Micah Matlock

of Midland, Texas.  Alexandra sought Doug's consent to relocate to Texas to be closer to Mr. Matlock and her business interests there.  The proposed relocation became a point of conflict between the two.  After a verbal altercation between Doug and Mr. Matlock during an exchange of A.R. in early January 2022, Doug retained possession of A.R. until he was able to file for relief to prevent Alexandra from relocating and to limit A.R.'s exposure to Mr. Matlock.  The parties' attorneys conferred between themselves and their clients and arrived at the agreement contained in a second interim order dated January 14, 2022 (the "Second Interim Order").

The Second Interim Order required Alexandra to "not relocate from the Shreveport/Bossier area pending further orders of this Honorable Court."  The Second Interim Order also required Doug to immediately return A.R. to Alexandra.  Doug's visitation was extended to include Mondays from 5:00 p.m. to 8:00 p.m.; Thursdays from 5:00 p.m. until 8:00 p.m.; and every other weekend from Saturday at 10:00 a.m. to Sunday at noon beginning Saturday, January 15, 2022.

In addition to those referenced modifications to the First Interim Order, the Second Interim Order prohibited the parties from having overnight visitors of the opposite sex, unless related by blood, marriage, or affinity, while having physical custody of A.R.  Additionally, the Second Interim Order prohibited Mr. Matlock from being around A.R. when Alexandra had physical custody.

After entry of the Second Interim Order, Alexandra retained new counsel and filed a motion to modify the Second Interim Order on April 13, 2022, to remove the aforementioned restrictions on visitation and presence

2

of Mr. Matlock. On May 11, 2022, the trial court signed an Amended Interim Order ("Amended Interim Order"), which removed the prohibition of overnight visitors of the opposite sex and allowed Mr. Matlock to be around the child during Alexandra's periods of physical custody. Mr. Matlock was prohibited from being present for the exchange of physical custody between the parents. All other provisions of the Second Interim Order were maintained.

Alexandra filed a petition for protection from abuse on July 14, 2022, seeking an order of protection and temporary custody of A.R. pending a hearing. She alleged that the child returned from a custodial period with Doug with a large red mark on her leg and further accused Doug of striking the child and causing the large red mark. The trial court signed an *ex parte* order of protection the same day, granting Alexandra temporary custody of A.R. pending the hearing.

The next day, Doug filed his own petition for protection from abuse. He claimed that A.R. was in danger because she was withheld from him "to deflect the allegation of abuse onto me although it happened at her home." In other words, Doug believed Alexandra was making a false claim of abuse against him, while at the same time abuse was going on in Alexandra's home.

Realizing that the competing requests for protective order involved an ongoing custody dispute, the trial court held a telephone conference with counsel for both parties on July 26, 2022. During that conference the court ordered that Alexandra's order of protection be dissolved and that her petition for protection from abuse be denied. Doug's petition for protection

from abuse was also denied. The court also ordered that Doug be allowed to make up for his missing days caused by the issuance of Alexandra's petition for protection from abuse.

Subsequent to the July 26, 2022, order, the trial court issued a supplemental order by which Alexandra was ordered to return A.R. to Doug by 5:00 p.m. on August 5, 2022, and that Doug was allowed to maintain physical custody of the child until August 25, 2022. Alexandra refused to comply with the court's order and kept A.R. well past the time by which she was supposed to deliver her to Doug.

On August 2, 2022, Doug filed an amended answer and reconventional demand. He claimed that since his original filing, the child had now reached three years of age, that since rendition of the First Interim Order, Alexandra had remarried and that she had relocated from the Shreveport/Bossier area without prior court approval and in violation of the relocation statute. Doug further alleged that he had been deprived of all contact with A.R. since Alexandra's apparent relocation. He claimed that this change in circumstances made joint custody untenable and thus sought sole custody.

Alexandra filed an answer and reconventional demand, petition for rule *nisi* for contempt, attorney fees, and costs on August 17, 2022. In her answer to Doug's reconventional demand, she admitted to marrying Mr. Matlock on June 27, 2022, but denied that she had relocated from the Shreveport/Bossier area.

On August 24, 2022, the trial court held a Zoom conference with counsel for the parties. Pursuant to the Zoom conference, the trial court

4

issued a Second Amended Interim Order ("Second Amended Interim Order"). The Second Amended Interim Order required the parties to immediately submit to drug testing. The trial court also appointed Robin Miley to conduct a mental health evaluation of the parties. Finally, the order adjusted the custodial periods to provide Doug with more time with A.R.

In May 2023, Ms. Miley delivered her report and recommendation to the parties and the court. Ms. Miley recommended that the parties be granted joint legal custody with Alexandra designated as the domiciliary parent. She recommended that Doug have physical custody every other weekend, except for summer when the school schedule would reverse, *i.e.* child to spend weekdays with Doug and every other weekend with Alexandra, and an equal division of holidays.

The matter was then set for trial, which was held on April 12, 2024, April 29, 2024, and April 30, 2024, at which the following evidence was adduced.

Alexandra testified that she had been dating Doug on and off for approximately three years before the birth of their child. She said that she moved in and out of his house during that time. After A.R. was born, Alexandra stated that she moved in with her parents until eventually moving to her own apartment in Shreveport. She said that she worked in her mother's dress shop until she met Mr. Matlock, at which time she decided to become involved in oilfield sales. Alexandra testified that she dated and eventually married Mr. Matlock, who shortly thereafter passed away. Following Mr. Matlock's sudden death, Alexandra testified that she decided not to have an autopsy performed on him. She said "in my grief I could not

stand" to have him cut up in an autopsy. She also elected to cremate him because she declared that to "be holy."

After Mr. Matlock passed away, Alexandra began dating David Mills. She said that both she and Mr. Mills have businesses in Midland, Texas. Alexandra stated that she started romantically seeing Mr. Mills in April or May 2023. When she met with Ms. Miley on March 27, 2023, she said that she told Ms. Miley she was not dating anyone at the time. However, Mr. Mills testified that they met and became romantically involved in February 2023. Mr. Mills also testified that Alexandra traveled to Midland to meet him every other week from Wednesday through Sunday or Monday. In furtherance of her oilfield sales endeavors, Alexandra formed corporations and limited liability companies, indicating that she intended to continue in those pursuits.

During her out-of-town trips, Alexandra admitted that she would keep A.R. during Doug's weekend and refuse his requests for additional time to make up for the lost weekend. She also admitted that Doug did in fact request additional time with A.R. At one point when Doug came to visit and check on her and A.R., she testified that she ordered him to leave and threatened to call the police on him.

Alexandra testified that she never left A.R. alone with her parents, as she did not feel comfortable doing so. However, she also indicated that when she had to leave town, generally to Midland for work, she would leave A.R. with her parents until she returned. Alexandra did not indicate that she ever reached out to Doug as her first choice to care for A.R. upon leaving town.

Alexandra also testified about preparing A.R. for school. At the time of trial there were approximately four months remaining before kindergarten was set to begin. Alexandra testified that she did not know in which school district either her address or her parents' address was located. Alexandra told Ms. Miley that she wanted to enroll A.R. in South Highlands Elementary Magnet School. However, as of April 2024, she had not had A.R. tested for admission to a magnet school. Alexandra also testified that she wanted her child to attend a "faith-based school" but failed to specify which school or how she plans to pay the school fees.

Alexandra was also asked about several risqué images which appeared on her public Instagram account. The photographs were in the nature of a boudoir photoshoot and depicted her scantily clad in provocative poses. Alexandra admitted that she took the photographs and posted them to the internet herself.

Alexandra was also asked about her medication regimen. She testified that she takes Clonazepan, Xanax, and Butalbital as needed. All of the medications were prescribed to her by her father, Dr. John Harris. Alexandra said she also took Lortabs "for cough and throat." Her father said he did not recall prescribing the medication to her. Finally, Alexandra admitted that she also took Vyvanse for ADHD, which was prescribed by a doctor other than her father and which came from a pharmacy in Natchitoches, Louisiana. She tested positive for all of those medications when she submitted to the court-ordered drug test.

Doug testified that after A.R. was born, he and Alexandra had an agreement to take things slow regarding his visitation with A.R. He said that

they agreed that he was going to get a little more time with her as she got older. Doug testified that as A.R. reached the age of three, the agreement was that A.R. would get to stay one overnight with him, and then they would gradually move up to weekends. He said that they had a good understanding at that time and a good plan, until Mr. Matlock came into the picture.

Doug also described the numerous times he would ask for additional time with A.R. for family weddings or when Alexandra was going out of town and how Alexandra denied each request. He further testified that on one particular occasion he stopped by Alexandra's parents' house to deliver Christmas gifts for Alexandra and A.R. He said that Alexandra's mother, Kim Harris, came outside and screamed and cursed at him and ordered him to never come around them again.

Doug also testified about how he planned to send A.R. to public schools in his area. He identified the local elementary school for his home address and discussed its strengths compared to other schools.

Doug further testified that none of his businesses required any out-of-town travel. Doug also said that when he has custody of his daughter, he does not work long hours. He also testified about the sizable house he owns in a quiet neighborhood in Bossier City, where he resided with his wife and stepchildren. A.R. has her own room at the house. Doug's wife, Lindsey Rogers, gave testimony expressing care and involvement in A.R.'s life.

Doug was also questioned about an altercation between himself and Mr. Matlock. Video evidence of the altercation was played for the court. The video shows Doug extremely upset by the presence of Mr. Matlock at an exchange of A.R. Doug was seen yelling and cursing at Mr. Matlock.

Doug and Alexandra testified about an incident wherein A.R. had a red mark on her leg. Both denied striking or hurting the child in any way. Dr. Harris testified that he observed a "large handprint that turned red and into a bruise. It [the bruise] would last for weeks." However, no evidence was presented at trial indicating that the red mark on A.R.'s leg ever turned into a bruise.

The trial court issued its opinion on June 26, 2024, which was filed of record on June 27, 2024. The trial court awarded the parties joint legal custody of A.R., with Doug designated as domiciliary parent. The trial court found Doug's home environment to be more stable. The trial court also noted its concerns about Alexandra's frequent trips to Midland, her reliance on controlled dangerous substances prescribed by her father, her defiance of previous court orders, and her having little understanding on where and when to enroll her child in school.

Alexandra now appeals.

**DISCUSSION**

*Custody of the Child*

For her first assignment of error, Alexandra argues that the trial court abused its discretion by removing A.R. from her "well-established and successful" home in favor of an "unproven and speculative" home with her father. She contends that she was the child's primary caretaker for most of her life and that custody should have been maintained absent some compelling reason to change it. Alexandra also notes that by the time the trial court issued its opinion, A.R. had been in her primary custody for over five years and Doug had exercised every other weekend visits with A.R.

9

She also claims that the trial court did not find anything negative about the environment Alexandra provided for A.R., and that the court specifically found nothing indicating that A.R. was being neglected in any way.

Alexandra also argues that Doug's historical involvement with A.R. was minimal. She claims that the "overwhelming evidence" was that Doug "did very little in the first three years of the child's life." Alexandra points to Ms. Miley's conclusion that A.R. is very attached to her maternal grandfather as support for the idea that A.R. is more attached to Alexandra's family than Doug's family. She also notes Ms. Miley's suspicion that Doug's wife provided more care for A.R. than Doug did.

Doug argues that the trial court correctly decided custody, designation of domiciliary parent, and allocation of custodial periods. He contends that the trial court's ruling was based on its observations of the witnesses, hearing of testimony, and weighing of the evidence in light of the factors listed in La. C.C. art. 134. As such, he argues that the trial court's findings of fact were not manifestly erroneous and that its decision was not an abuse of discretion.

The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; *Abrams v. Turner*, 52,922 (La. App. 2 Cir. 9/25/19), 282 So. 3d 304. This determination requires a weighing and balancing of factors favoring or opposing custody in respective competing parents on the basis of evidence presented in each particular case. *Abrams, supra*. The non-exclusive list of relevant factors to be considered in determining the best interest of the child found in La. C.C. art. 134 are:

(1) The love, affection, and other emotional ties between each party and the child.

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6) The moral fitness of each party, insofar as it affects the welfare of the child.

(7) The mental and physical health of each party.

(8) The home, school, and community history of the child.

(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11) The distance between the respective residences of the parties.

(12) The responsibility for the care and rearing of the child previously exercised by each party.

While the court is not bound to make a mechanical evaluation of all the statutory factors listed in La. C.C. art. 134, it should decide each case on its own facts in light of those factors. Nor is the court bound to give more weight to one factor over another; rather, when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. *Abrams, supra*. The factors are provided as a guide to

11

the court, and the relative weight given to each factor is left to the discretion of the trial court. *Id.*

The trial court has great discretion in child custody cases based on its opportunity to better evaluate the credibility of witnesses. Accordingly, the trial court's determination of custody issues is afforded great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. *McCormic v. Rider*, 09-2584 (La. 2/12/10), 27 So. 3d 277; *Mayo v. Henson*, 42,250 (La. App. 2 Cir. 5/9/07), 957 So. 2d 318.

As long as the trial court's factual findings are reasonable in light of the record when viewed in its entirety, the appellate court may not reverse, even though convinced it would have weighed the evidence differently if acting as the trier of fact. *Lucky v. Way*, 51,706 (La. App. 2 Cir. 9/1/17), 245 So. 3d 110, *writ denied*, 17-1657 (La. 10/27/17), 228 So. 3d 1233.

As this court has noted:

> In child custody cases where two parents are fervently competing for custody and domiciliary status of the children, frequently the trial court must determine the best interest of the children solely from the testimony of the parents and their respective relatives or friends. This naturally passionate and self-interested testimony is rarely objective, leaving it to the trial court, who is in the best position to view firsthand the demeanor and tone of the witnesses, to assess the credibility of witnesses and decide how much weight to give the testimony in light of the factors of La. C.C. art. 134.

*Abrams, supra*, 282 So. 3d at 312.

Considering the testimony and evidence available to the trial court, we do not find its ruling to be an abuse of its discretion. The record reveals that the trial court took great care in analyzing the Article 134 factors in its written reasons for judgment. The trial court heard the witnesses and

reviewed the evidence provided by each party, and it was in the best position to assess the credibility of witnesses and weigh the factors of Article 134.

Alexandra argues that the trial court gave "few reasons" for not maintaining the continuity of the environment she was able to provide for A.R. for the first three years of her life. However, the trial court gave a lengthy opinion full of reasons for not maintaining A.R.'s current environment. Those reasons were based on the trial court's review of the testimony and demeanor of the parties and their witnesses. Furthermore, the child's primary caregiver is but one factor the court considers in arriving at a decision on the child's best interest.

We find that A.R.'s home environment with Alexandra was far from "stable and successful" as she has described it. During the course of A.R.'s life, Alexandra bounced in and out of a relationship with Doug, moved in and out of his house, moved in with her parents, moved out to her own apartment, traveled with A.R. to Midland to visit Mr. Matlock, dated Mr. Matlock, married Mr. Matlock, and was dating Mr. Mills at the time of trial. We find significant Mr. Mills' testimony that Alexandra traveled to Midland to meet him every other week from Wednesday through Sunday or Monday.

The record also shows that Doug's past involvement with A.R. was limited not by his own choice but by Alexandra and her parents. Alexandra admitted that she would keep A.R. during his weekend for out-of-town trips and refuse his requests for additional time to make up for the lost weekend. Doug also testified about an incident wherein he attempted to visit to check on A.R. and Alexandra ordered him to leave and threatened to call the police.

We further find that Alexandra is not well-suited to continue the educational needs of A.R. going forward. At the time of trial in April 2024, A.R. was five years old, which was the age for entering kindergarten in August 2024, but Alexandra and her mother testified that they did not know in which school district they were located.

Primary caregiver status is not the only factor to consider when evaluating the evidence to determine the best interest of the child. The trial court was able to witness the testimony and observe the demeanor of the parties and eventually concluded that the environment Doug could provide was superior to that of the environment offered by Alexandra.

The trial court was also well within its discretion to discount the opinion of Ms. Miley regarding domiciliary parent status. We agree with Doug that Ms. Miley's report was based on "a less than honest" presentation of the facts by Alexandra. Furthermore, we echo the trial court's concern about Alexandra's use of controlled dangerous substances prescribed by her father and her posting of provocative photographs of herself on her public Instagram page.

The trial court's decision was based on its factual findings, which in turn were based on its impression of the witnesses and their credibility. These factual findings are more than reasonable in light of the record viewed in its entirety. We find that the trial court's decision was well within the wide discretion afforded the trial court in making such decisions. This assignment of error is without merit.

*Frequent and Continuing Contact*

For her second assignment of error, Alexandra argues that the trial

court erred as a matter of law by failing to grant her sufficient physical custody to guarantee "frequent and continuing contact" with A.R. She contends that a joint custody implementation order is required to allocate the time periods for each parent such that the child is assured of frequent and continuing contact with both parents, and that the JCIP in this case does not do so. She notes that she went from having most of the time with A.R. to having every other weekend, one half of the holidays, and half of the time in the summer months. She claims that this court has previously recognized that every other weekend custody plans do not meet the mandate of "frequent and continuing contact" as provided in La. R.S. 9:335(A)(2)(a).

Doug claims that the trial judge did not commit legal error in allocating custody between the parties in the JCIP, because the JCIP provides Alexandra with adequate physical custody and frequent and continuing contact with A.R.

The trial court's finding that joint custody is in the best interest of the child does not necessarily require an equal sharing of physical custody. *Collins v. Collins*, 36,629 (La. App. 2 Cir. 10/23/02), 830 So. 2d 448. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. *Abrams v. Turner, supra*. Every child custody case must be viewed on its own particular set of facts and relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. *Nichols v. Nichols*, 32,219 (La. App. 2 Cir. 9/22/99), 747 So. 2d 120.

A joint implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is

assured of frequent and continuing contact with both parents. La. R.S. 9:335(A)(2)(a). Our jurisprudence has not defined "frequent and continuing" in terms of a minimum amount of time. Frequent and continuing contact must be determined based on the facts of each case. *Fuller v. Fuller*, 54,098 (La. App. 2 Cir. 7/21/21), 324 So. 3d 1103, *writ denied*, 21-01223 (La. 9/27/21), 324 So. 3d 621. There is no requirement in our law that every joint custody plan award the nondomiciliary parent 100 days or more of overnight physical custody in order to ensure frequent and continuing contact. *Stephenson v. Stephenson*, 37,323 (La. App. 2 Cir. 5/14/03), 847 So. 2d 175.

In *Ellinwood v. Breaux*, 32,730 (La. App. 2 Cir. 3/1/00), 753 So. 2d 977, this court noted that in school-age children, weekend and holiday visitation was appropriate, but the court gave the mother, Ms. Breaux, an additional two weeks in August. Ms. Breaux already had two weeks in June and two weeks in July. The additional two weeks in August gave Ms. Breaux a total of six weeks in the summer.

Here, Alexandra was awarded custodial periods every other week in the summer. Out of 12 weeks, that amounts to 6 weeks, which is the same as the modification ordered by this court in *Ellinwood*.

In *O'Brien v. O'Brien*, 30,001 (La. App. 2 Cir. 12/10/97), 704 So. 2d 933, a case relied upon by Alexandra, the court found that Mrs. O'Brien was denied frequent and continuing contact with the child by only being afforded 94-98 days of visitation per year. In this case, however, the JCIP provides Alexandra with 104-107 days per year, depending on the split of the school holidays. Moreover, in this case both Alexandra and Mr. Mills testified that

16

Alexandra's work schedule requires her to be in Midland every other weekend, and the JCIP coincides with her work schedule.

Based on the particular circumstances of this case, we find that the JCIP maintains the stability and continuity of Doug's home while also affording Alexandra adequate physical custody. Such a schedule meets or exceeds the requirements of the jurisprudence regarding same. This assignment of error has no merit.

## CONCLUSION

For the foregoing reasons, the trial court's ruling is affirmed. The costs of the appeal are assessed to Alexandra.

**AFFIRMED.**